# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-13-00804-CR

**Kaitlyn Lucretia Ritcherson, Appellant**

**v.**

**The State of Texas, Appellee**

### FROM THE DISTRICT COURT OF TRAVIS COUNTY, 331ST JUDICIAL DISTRICT
### NO. D-1-DC-11-302663, HONORABLE DAVID CRAIN, JUDGE PRESIDING

## O P I N I O N

Kaitlyn Lucretia Ritcherson was charged with the murder of Fatima Barrie under two alternative theories. *See* Tex. Penal Code § 19.02(b)(1)-(2) (setting out alternative elements for murder). During the trial, Ritcherson requested a jury instruction for the lesser-included offense of manslaughter, *see id.* § 19.04 (listing elements for crime of manslaughter); *see also* Tex. Code Crim. Proc. art. 37.09 (defining lesser-included offense), but the district court denied that request. At the end of the trial, the jury found Ritcherson guilty and sentenced her to 25 years' imprisonment, and the district court entered its judgment in accordance with the jury's determinations. On appeal, Ritcherson asserts that the district court erred by denying her lesser-included-offense instruction, by excluding a video recording of her at the police station that captured her reaction when the police told her that Barrie would die from her injuries, and by admitting hearsay evidence during the punishment phase. We will affirm the district court's judgment of conviction.

## BACKGROUND

The seemingly senseless tragedy at issue in this case occurred when two groups of friends, who for the most part did not know each other, inauspiciously crossed paths after leaving a club late one night in downtown Austin, Texas. The first group was composed of the victim, Barrie, as well as her friends Jamie Hopkins, Hopkins's boyfriend Kelvin Jones, and Jones's friend Ronald Pace. The second group was composed of Ritcherson and her friends Ashley York, Lynsie Carson, and Shronda Dobin as well as Chris Carson and Ryan Moore, who is York's boyfriend.[1]

On the night of the offense, Barrie made plans with Hopkins to go to a downtown club. After Barrie and Hopkins left for the club, Jones decided to go to the same club with Pace and another friend. Meanwhile, Ritcherson was socializing with her friends at York and Moore's home. Although Ritcherson had plans to meet Michael Boone to go to a concert and then go to dinner, the remainder of her group made plans to go to the same club that Barrie and her friends were going to. While they were getting ready for the evening, Ritcherson and her friends were drinking and socializing together. After Ritcherson left for the concert, York, Lynsie, and Dobin arranged to have a ride to drop them off at the club, and Chris, Moore, and another friend drove to the club separately.

While the two groups were inside the club, Chris and Pace had a negative encounter. The two of them had previously met, and the argument inside the club related to that prior interaction. At some point in the evening, Lynsie was kicked out of the club because she became too intoxicated, and York called Ritcherson, who was eating dinner with Boone, and asked her if she

---

[1] Several of the individuals involved in this case are related and share identical last names. Where needed for clarity, we will refer to those individuals by their first names.

would drive to the club to help with Lynsie. Ritcherson agreed, drove Boone home, and drove to the club. After parking her car near the club, Ritcherson helped put Lynsie in her car and then headed to the club to socialize with some people that were outside.

When the club closed at the end of the evening, everyone inside the club walked outside. After leaving the club, Dobin walked to Ritcherson's car to check on Lynsie, who was sleeping in the car. Around this time and after going outside, Chris and Pace continued their argument from earlier in the evening, but the altercation never became physical. During the argument, Jones stood next to his friend Pace and attempted to settle the dispute peacefully. Similarly, Moore stood next to his friend Chris in the event that the argument escalated. Ritcherson and York also stood near Pace and Moore. When Barrie and Hopkins were leaving the club, they noticed the argument between Chris and Pace and went to see what was going on.

The events that occurred next are disputed and form the basis for the appeal in this case, but what is not disputed is that Ritcherson and Barrie got into an argument, that the dispute became physical at some point, that York left the area when the situation became physical, that Ritcherson stabbed Barrie in the chest with a knife, and that Ritcherson sustained an injury to her leg during the fight. After she was stabbed, Barrie took a few steps and then collapsed on the ground, and someone who witnessed the events called 911. When EMS arrived on the scene, Barrie was rushed to a nearby hospital where it was discovered that the knife had reached Barrie's pulmonary artery. Although the treating physicians and hospital staff worked tirelessly to save Barrie's life, Barrie died from her injuries several days later.

3

Shortly after the stabbing, Ritcherson caught up with York, who was walking towards Ritcherson's car. When Ritcherson and York arrived at the car, the two of them and Dobin discussed the wound to Ritcherson's leg. Dobin offered to drive Ritcherson to the hospital, but Ritcherson refused. Dobin drove Ritcherson's car in the direction of York's home in south Austin, but eventually Ritcherson asked Dobin to drive her to the hospital when her leg started hurting. Simultaneously, Moore and Chris left the scene, and Moore drove them back to his home. After talking with York, Moore drove to the hospital and met up with his friends. Due to the nature of Ritcherson's wound, the staff at the hospital called the police.

After conducting an investigation of the scene outside the club and interviewing witnesses that were still at the club, the police interviewed Ritcherson after picking her up from the hospital. A few days later, the police arrested Ritcherson, and she was charged with alternative counts of murder. First, Ritcherson was alleged to have "intentionally and knowingly cause[d] the death of Fatima Barrie, by stabbing Fatima Barrie with a knife or another object . . . , each of which was a deadly weapon, during the commission of this offense." *See* Tex. Penal Code § 19.02(b)(1). Second, Ritcherson was alleged to have committed "an act clearly dangerous to human life" with the "intent to cause serious bodily injury to Fatima Barrie . . . by stabbing Fatima Barrie with a knife or another object . . . , each of which was a deadly weapon, during the commission of this offense." *See id.* § 19.02(b)(2).

Subsequent to Ritcherson being charged, a jury trial was held. At the end of the first trial, a hung jury was reached, and the district court granted a mistrial. A few months later, another trial was held. During that trial, various witnesses testified regarding their recollections of the events

4

in question, and testimony from several witnesses who testified during the first trial was read for the jury because those witnesses were not available during the second trial. After considering the evidence, the jury determined that Ritcherson was guilty of murder, and the district court entered a judgment of conviction in accordance with the jury's determination. Ritcherson appeals the district court's judgment of conviction.

## DISCUSSION

On appeal, Ritcherson challenges various rulings made by the district court. In her first issue, as set out above, Ritcherson contends that the district court erred by denying her request for a jury instruction for the lesser-included offense of manslaughter. In her second and third issues, Ritcherson asserts that the district court erred by denying her request during the guilt or innocence phase as well as the punishment phase of the trial to have a video recording of her at the police station played for the jury. The video chronicled the moments in which the police told her that she was going to be arrested and that Barrie was going to die. Finally, Ritcherson argues that the district court erred during the punishment phase when it overruled her objection to the admission of testimony regarding an extraneous act in which she allegedly attempted to stab her brother during a dispute.

### Lesser-Included Offense

In her first issue on appeal, Ritcherson contends that the district court erred by denying her request for a jury instruction for the lesser-included offense of manslaughter.

When reviewing an alleged jury-charge error, appellate courts first determine whether an error exists. *Kirsch v. State*, 357 S.W.3d 645, 649 (Tex. Crim. App. 2012); *Ngo v. State*,

175 S.W.3d 738, 743 (Tex. Crim. App. 2005). If the court determines that there was an error, it then decides whether the error resulted in harm sufficient to warrant a reversal. *Kirsch*, 357 S.W.3d at 649; *Ngo*, 175 S.W.3d at 743. When deciding whether a lesser-included-instruction should have been given, courts must determine whether the offense listed in the requested instruction is actually a lesser-included offense of the offense that the defendant was charged with. *Rice v. State*, 333 S.W.3d 140, 144 (Tex. Crim. App. 2011); *see Hall v. State*, 225 S.W.3d 524, 535 (Tex. Crim. App. 2007). If the reviewing court determines that the offense listed in the requested instruction is a lesser-included offense, the reviewing court must then determine whether the evidence presented during the trial supports the requested instruction. *Goad v. State*, 354 S.W.3d 443, 446 (Tex. Crim. App. 2011); *Rice*, 333 S.W.3d at 144.

As discussed previously, Ritcherson was charged under alternative theories of murder. Under the first theory, as set out in subsection 19.02(b)(1) of the Penal Code, Ritcherson was alleged to have "intentionally or knowingly cause[d] the death of an individual," *see* Tex. Penal Code § 19.02(b)(1), and under the second theory, as set out in subsection 19.02(b)(2), Ritcherson was alleged to have intended "to cause serious bodily injury" and to have committed "an act clearly dangerous to human life that cause[d] the death of an individual," *see id.* § 19.02(b)(2). "'Serious bodily injury' means bodily injury that creates a substantial risk of death or that causes death, serious permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ." *Id.* § 1.07(a)(46).

Under the Penal Code, an individual commits manslaughter "if he recklessly causes the death of an individual." *Id.* § 19.04. Accordingly, manslaughter only differs from murder as set

6

out in subsection 19.02(b)(1) in that manslaughter requires a less culpable mental state, *see* Tex. Code Crim. Proc. art. 37.09(3) (explaining that offense is lesser-included offense if "it differs from the offense charged only in the respect that a less culpable mental state suffices to establish its commission"), and the State does not dispute on appeal that manslaughter is a lesser-included offense of the first theory of murder charged, *see Arnold v. State*, 234 S.W.3d 664, 671 (Tex. App.—Houston [14th Dist.] 2007, no pet.) (explaining that "it is well-established that manslaughter is a lesser-included offense of murder"); *see also Cavazos v. State*, 382 S.W.3d 377, 384 (Tex. Crim. App. 2012) (concluding that manslaughter is lesser-included offense for murder under subsection 19.02(b)(2) as well and stating that manslaughter "differs from intending to cause serious bodily injury with a resulting death only in the respect that a less culpable mental state establishes its commission"). Accordingly, the first prong is satisfied in this case.

Turning to the second prong, when deciding whether the evidence supports the requested instruction, the reviewing court considers all of the evidence admitted at trial and not just the evidence presented by the defendant, *Goad*, 354 S.W.3d at 446; *see Rousseau v. State*, 855 S.W.2d 666, 672 (Tex. Crim. App. 1993), and must determine whether there is some evidence from which a rational jury could acquit the defendant of the greater offense and convict the defendant of the lesser offense, *Cavazos*, 382 S.W.3d at 385. In other words, courts must evaluate if there is some evidence that would allow the jury to rationally determine that if the defendant was guilty, he was only guilty of the lesser offense. *See Rice*, 333 S.W.3d at 145; *Guzman v. State*, 188 S.W.3d 185, 188-89 (Tex. Crim. App. 2006); *see also Rice*, 333 S.W.3d at 145 (explaining that evidence must prove lesser-included offense as rational and valid alternative to offense charged). To meet

7

this requirement, there must be affirmative evidence that raises the lesser-included offense and that negates an element of the greater offense. *Cavazos*, 382 S.W.3d at 385. "'Anything more than a scintilla of evidence is sufficient to entitle a defendant to a lesser charge.'" *Sweed v. State*, 351 S.W.3d 63, 68 (Tex. Crim. App. 2011) (quoting *Bignall v. State*, 887 S.W.2d 21, 23 (Tex. Crim. App. 1994)). The "threshold showing is low," but "'it is not enough that the jury may disbelieve crucial evidence pertaining to the greater offense, but rather, there must be some evidence directly germane to the lesser-included offense for the finder of fact to consider before an instruction on a lesser-included offense is warranted.'" *Id.* (quoting *Skinner v. State*, 956 S.W.2d 532, 543 (Tex. Crim. App. 1997)). In performing this analysis, the court may not consider the credibility of the evidence supporting the lesser charge or consider whether that evidence is controverted or conflicts with the other evidence. *Goad*, 354 S.W.3d at 446-47.

For this case, the relevant inquiry turns upon Ritcherson's intent. The State was required to prove that Ritcherson acted intentionally or knowingly when she caused the death of Barrie or that Ritcherson intended to cause serious bodily injury to Barrie. *See* Tex. Penal Code § 19.02(b)(1)-(2). To be guilty of manslaughter, there must be evidence establishing that Ritcherson acted recklessly when she caused Barrie's death, *see id.* § 19.04, and under the Penal Code, "[a] person acts recklessly . . . , with respect to circumstances surrounding his conduct, when he is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur," *id.* § 6.03(c). Accordingly, for Ritcherson to be entitled to the instruction, there must be some evidence that she did not intend to cause either death or serious bodily injury and some evidence that would allow a rational jury to determine that she was aware of but disregarded a

8

substantial and unjustifiable risk that death would occur as a result of her conduct. *See id.* §§ 6.03(a), (c) (setting out circumstances in which person acts intentionally or recklessly), 19.02(b)(1)-(2) (listing alternative elements for murder), .04 (describing offense of manslaughter); *cf. Cavazos*, 382 S.W.3d at 385 (analyzing whether second prong was satisfied for lesser-included offense of manslaughter).

During the trial, various members from both groups of friends, several police officers, several medical professionals, and witnesses at the scene who were unaffiliated with either group of friends testified regarding the events on the night of the offense, regarding the injuries that Barrie and Ritcherson sustained, and regarding statements that Ritcherson made after the incident. In addition, a video of Ritcherson's interview with the police that was taken a few hours after the incident was played for the jury.[2]

*Barrie's Group of Friends*

When presenting its case, the State called two members of Barrie's friend group that were present at the club, Hopkins and Jones, to testify regarding the events that they witnessed. Regarding the events leading up to the stabbing, Hopkins testified that when she and Barrie left the club, they saw a group of people arguing. In particular, she related that she saw Ritcherson acting

---

[2] During the trial, some of the witnesses did not identify Ritcherson or know her name, and some did not know Barrie's name. However, the undisputed witness testimony and the DNA analyses performed on items recovered from the scene established that Ritcherson and Barrie were the individuals involved in the dispute at issue, and no evidence was introduced suggesting that there was a physical fight between two other women at the club on the night in question. Moreover, Ritcherson does not assert on appeal that she was not the person who stabbed Barrie or that she was not properly identified as the offender during the trial, and during the trial, Ritcherson conceded that identity was not an issue. Accordingly, when summarizing the testimony from the witnesses, we will refer to the individuals involved in the dispute as Ritcherson and Barrie for ease of reading even if the witnesses did not use those names to identify the participants.

"rowdy." In addition, she stated that as they were walking by, Ritcherson and another woman came up to them and said "[s]omething negative" to them, and Hopkins admitted that they said something negative back and that she might have called Ritcherson a "bitch." She described the encounter as "a bad situation," stated that she felt threatened, and explained that she communicated to Ritcherson that she had no desire to fight. Next, Hopkins related that she grabbed Barrie's arm and tried to move them out of the area.

When describing the events immediately preceding the stabbing, Hopkins explained that Jones grabbed her to get her away from Ritcherson, that she noticed when she was being pulled away that Ritcherson had "something in her hand" and was "waiving it in the air," and that the object "looked like a knife." When questioned about testimony that she had given in the previous trial, she recalled that she previously testified that the blade of the object that she thought was a knife was two and a half inches long. In her testimony during this trial, Hopkins admitted that she could not see what was happening to Barrie after she was pulled away, but she explained that she did not see Barrie try to hit Ritcherson. In addition, Hopkins related that after Jones pulled her from the situation, he went back to get Barrie, that the three of them started walking away, and that Barrie collapsed when they were walking and fell to the ground. Finally, Hopkins recalled that she noticed that Barrie's eyes rolled back into her head, that Barrie did not respond to any questions that were asked of her, and that Barrie was bleeding.[3]

---

[3] During the trial, Detective Michele Aparicio was called to the stand to discuss her conversation with Hopkins at the scene after the incident. In her testimony, Officer Aparicio said that Hopkins told her that something happened that caused Barrie to turn around, that Barrie turned back around and collapsed, and that she did not see Barrie get stabbed.

10

After Hopkins finished her testimony, Jones was called to the stand. In his testimony, Jones explained that someone from Carson's group yelled an insult at him, that Hopkins and Barrie heard the comment when they were leaving the club and became offended, that Hopkins and Barrie turned and responded to the insults, and that he saw that "another situation was about to occur" so he "picked Hopkins up and basically turned her around to push her off down the street." Next, he stated that he went back for Barrie and "picked her up and we walked away," recalled that her hand was in the air when he picked her up but that she did not have anything in her hand, and agreed that Barrie was "swinging at" or "going at" Ritcherson. In addition, he testified that after he pulled Barrie out of the situation, the group started to walk away and that after they walked for a few steps, Barrie fell to the ground. Furthermore, although he explained that he did not see Barrie get stabbed, it was apparent from her injuries that she had been stabbed.

*Ritcherson's Group of Friends*

When presenting its case, the State also called to the stand various members of Ritcherson's friend group, including York, Dobin, and Moore. During the trial, Ritcherson called her friend Chris to the stand.

In her testimony regarding the events leading up to the stabbing, York recalled that Barrie and Hopkins started yelling at Chris during Chris's argument with Pace, that Ritcherson told the girls "to leave it alone" because the argument had nothing to do with them, that Barrie started yelling at Ritcherson, that Ritcherson started laughing at Barrie, and that Barrie and Hopkins started yelling at Ritcherson. Next, York testified that she noticed that Ritcherson had a knife in her hand, that she tried to pull Ritcherson away, that she told Ritcherson that they should leave, and that

11

Ritcherson would not leave. Moreover, York related that she left the area and headed to the car after Ritcherson refused to leave and that as she was leaving, she saw Barrie hit Ritcherson on the head; however, York clarified that she never saw Ritcherson attack Barrie. In addition, York related that no one else had a knife, that there was nothing going on around them that would have justified Ritcherson pulling out a knife, that she did not believe that Ritcherson was in danger when she got hit in the head, and that if she thought Ritcherson was in danger, she would not have left.[4]

When Dobin testified, she explained that shortly after she went to the car to check on Lynsie, Ritcherson and Moore returned to the car and said that Ritcherson had an injury to her leg, that Ritcherson stated that she did not know how it happened, that Ritcherson never mentioned being threatened by anyone, and that Ritcherson never said that she was defending herself or that she was attacked. In addition, she explained that Ritcherson carried a small pocket knife that she used to cut hair extensions.

After Dobin and York testified, the State called Moore to the stand. In his testimony, he explained that Chris had had too much to drink that night and got into an argument with Pace and that he, York, and Ritcherson were standing by near where the argument was occurring. Next, he related that Barrie came out of the club with Hopkins, that they saw the argument with their friend Pace, that they thought that Ritcherson and York were involved, that they started arguing with

_____

[4] In her testimony, York admitted that she repeatedly lied to the police in order to protect Ritcherson and admitted that she previously told the grand jury that she and Barrie bumped into one another, that they both said excuse me, that Ritcherson thought Barrie said something rude and started arguing with Barrie and Hopkins, that Ritcherson had a knife in her hand during the argument, and that Barrie hit Ritcherson in the head with her phone. Regarding her grand jury testimony, York also recalled that she previously testified that she was not sure if Barrie hit Ritcherson because she was walking away at that point.

12

Ritcherson and York, that Hopkins tried to pull Barrie away and said that the argument had nothing to do with them, that Ritcherson and York started making fun of Barrie, that Ritcherson and York were talking loudly but not directly at Barrie,[5] that Barrie got mad, that Barrie took off her shoes, that Barrie yelled "fuck you-all," that Barrie lunged at Ritcherson, and that Barrie's friend stopped her. When discussing this incident, Moore explained that Ritcherson did not seem scared. Next, Moore recalled that Barrie lunged a second time, that Barrie had an object in her hand, that he did not know if it was a phone or a shoe, that the object was not a gun or a knife, that Barrie "made contact," and that he thought it was on Ritcherson's forehead; however, he later clarified that Barrie did not use a shoe to hit Ritcherson and that he did not actually see the hit, but he explained that he saw Ritcherson later with knots on her forehead and "put two and two together."[6]

Furthermore, Moore explained that he was holding Ritcherson back and that Hopkins was pulling Barrie away, and he recalled that Ritcherson was swinging her hand at Barrie when he was trying to hold her back. When describing this exchange, he stated that he did not see anything in Ritcherson's hand at the time, that Ritcherson made one overhand swing, and that Ritcherson did not reach over Barrie's back or shoulder, and he agreed that it seemed like Ritcherson swung as a reflex to getting hit. Later, he explained that Ritcherson was defending herself from being hit but agreed that the hit did not give Ritcherson the right to kill Barrie. Next, he testified that Barrie fell

_____

[5] When testifying, Moore later clarified that although Barrie could probably see York and Ritcherson laughing, she probably could not hear the insults that they were saying. In addition, Moore said that Ritcherson was insulting Barrie and that Ritcherson does that to provoke people; however, he also testified that Barrie was the person who initiated the taunting.

[6] During the trial, Boone testified that Ritcherson did not have knots on her head earlier in the evening.

13

down, that Hopkins helped her up, that they walked to the sidewalk, and that Barrie collapsed between two cars.

Also, Moore explained that he "tussle[d]" with Ritcherson, noticed that she had a knife, tried to get the knife away from her, managed to get the knife out of her hand, and kicked it away. When describing the knife, he said that it was short and was approximately four and a half or five inches long, including the handle, and testified that there was no reason for Ritcherson to have the knife at that moment, that Barrie did not do anything that could have caused serious bodily injury or death to Ritcherson, and that Ritcherson never said or did anything that led him to believe that she feared for her life or safety. Finally, Moore explained that after he got the knife out of Ritcherson's hand, Ritcherson appeared "shocked or confused," left the area, and met up with York, who left before the stabbing occurred after unsuccessfully trying to get Ritcherson to leave and after telling Ritcherson, "It don't have nothing to do with us, let's go."

During her case in chief, Ritcherson called Chris to the stand. In his testimony, Chris stated that during his argument with Pace, Barrie moved towards him carrying a high-heeled shoe in her raised hand, and he recalled that it seemed like she was "going to hit me." Further, he stated that instead of hitting him, Barrie went past him and hit Ritcherson on the head and that he saw Ritcherson and Barrie "crash into each other." However, he later clarified that he did not actually see where the hit connected, that he did not see what happened before Barrie hit Ritcherson, that he did not see anything after the hit because people gathered around the fight, and that he never saw a knife.

14

In addition to the testimony from members of the two groups, the State also called to the stand other individuals who were present at the club on the night in question. First, the State called Stefne Henderson who testified that she was at the club on the night of the offense and that when she left the club, she saw Ritcherson arguing with someone. Specifically, Henderson recalled that she saw Ritcherson arguing with a group of men, that one of Ritcherson's friends pulled her back away from the altercation, that the men quieted down, that Ritcherson moved around where the men were standing, that Ritcherson "started arguing with" a woman other than Barrie, that the women argued but nothing physical happened, that Ritcherson and Barrie started arguing, that it looked like Ritcherson "was looking for a fight because she was arguing with so many people," that Barrie never raised her hand or tried to touch Ritcherson, that Barrie did not have anything in her hand, that Barrie turned to walk away, that Ritcherson raised a knife into the air, and that Ritcherson stabbed Barrie.

When describing the stabbing, Henderson related that Ritcherson reached over Barrie's right shoulder and stabbed Barrie. Furthermore, Henderson testified that it appeared that Barrie did not know that she had been stabbed because she continued to walk forward and then collapsed. Next, Henderson recalled that Moore struggled with Ritcherson to get the knife away from her, that Ritcherson dropped the knife, and that Ritcherson walked away. During her testimony, Henderson agreed that she had previously characterized the knife as "huge" and that she had previously estimated that the knife had a six-inch blade when she talked to the police after the incident.

Next, the State called Oghenebrohien Shermay Uwalogho who explained that on the night of the offense, she was hired as a photographer for the event at the club. Moreover, she related

15

that after the club closed, she heard two groups of people arguing. In her testimony, she explained that after the men from the two groups stopped arguing, women from both groups, including Ritcherson and Barrie, started arguing. Next, she testified that she saw Ritcherson hold a knife in the air above her head but that Moore was restraining her, was trying to stop her from using the knife, and was trying to calm her down.

Further, Uwalogho testified that she saw Barrie walk away with her friend and stated that after Barrie started walking away, she saw Ritcherson move away from Moore and out of her sight and that she later saw Barrie laying on the ground bleeding. In addition, she admitted that she did not see Ritcherson stab Barrie but explained that Ritcherson was the only person she saw with a knife. When describing Ritcherson's demeanor, Uwalogho testified that Ritcherson appeared to be "in defense mode" and was acting like she was protecting herself, but Uwalogho clarified that she simply meant that Ritcherson was in a heated altercation and that everyone involved was in defense mode and defending themselves. Moreover, she recalled that she did not see anyone use any kind of weapon against Ritcherson and stated that she never saw a moment where Ritcherson had to physically defend herself.

During her case in chief, Ritcherson called Britney Carson to the stand. In her testimony, Britney explained that she is Chris's sister and that she was at the club on that night with a different group of friends. Moreover, she stated that although she saw Chris with his friends, she did not hang out with them inside the club. Further, she testified that when she was leaving the club, she saw York standing by Ritcherson, that York was in an argument with a group of girls, that York told the group that "[t]his has nothing to do with you," that Ritcherson was not participating, and that

16

"a group of girls lunge[d] towards [York] and [Ritcherson], then they take a couple steps back. The next thing I see [Barrie] hit [Ritcherson]" on the forehead with her hand while holding a cell phone. When describing the hit, Britney stated that the hit was very loud, that she thought Ritcherson would be injured after getting hit that hard, that Ritcherson stumbled backwards after the hit but did not fall, and that Barrie slipped after hitting Ritcherson.

Next, Britney related that she noticed that Ritcherson had a knife in her right hand; that Ritcherson was trembling; that Ritcherson looked scared; that Barrie said, "I don't care about your knife, I'm still going to kick your ass"; and that Barrie's tone was threatening. Furthermore, Britney stated that the other group of girls, including Barrie, rushed towards Ritcherson, that there was a short "violent clash" when a huge crowd rushed together, and that she did not see anything after the clash. In her testimony, Britney stated that she did not see a knife in Ritcherson's right hand before she was hit but stated that Ritcherson's left hand was on her purse prior to her getting hit. When describing the knife, Britney said that the knife was small and that although she could not remember exactly how long the blade was, she agreed that her previous testimony that the blade was two and a half inches long was accurate.

*Law-Enforcement Witnesses*

In addition to the eyewitness testimony, the State called various law-enforcement officers to testify regarding their investigations of the offense and regarding interviews that they conducted during their investigations.

First, Detective Anthony Nelson explained that when he interviewed Ritcherson about the incident, Ritcherson admitted that she had been in a fight with another woman that night,

17

stated that the other woman "came at her," and related that someone hit her. In addition, although Officer Nelson also revealed that Ritcherson never stated that she was acting in self-defense, he recalled that Ritcherson stated that she was concerned about her safety and about trying to get to safety when the fight broke out. Further, Officer Nelson related that Ritcherson stated that she was the one who started the argument, which caused the other woman to come after her, but Officer Nelson clarified that Ritcherson never said the other person came at her with a weapon or object of any kind. Finally, Officer Nelson related that Ritcherson denied stabbing anyone or being near the person when she was stabbed.[7] A recording of this interview was admitted into evidence during trial and was played for the jury. On the video, Ritcherson admitted that she was in a fight with Barrie, that she had been "talking mess" about Barrie, and that although Barrie's friends were pushing her away, Barrie was still able to punch her.

Next, the State called Officer Paul Johnson, who testified that he responded to the scene and talked with a witness to the incident named Shermay Green. Further, he related that Green revealed that she saw Ritcherson and Barrie arguing, that Ritcherson had a knife that was approximately four inches long, that some men were trying to separate Ritcherson from Barrie, and

---

[7] In his testimony, Officer Nelson related that Ritcherson explained that she did not know how she sustained an injury to her leg. However, Officer Nelson also explained that "it's not uncommon" for an individual who stabs another person to sustain a self-inflicted stab wound. During the trial, the State called Tinny Jones, who was a nurse with the Travis County Sheriff's Office, and Jessica Oglesby, who was a counselor for the Travis County Sheriff's Office, to the stand to discuss conversations that they had with Ritcherson after the incident. Both witnesses testified that Ritcherson explained that she accidentally stabbed herself in the leg during a fight. Relatedly, the nurse who treated Ritcherson on the night of the offense, Jenny Stepp, characterized Ritcherson's wound as small, not serious, not life threatening, and more like a cut. Moreover, Stepp testified that stab wounds are normally deeper than the injury that Ritcherson sustained.

that Ritcherson ran around the men and ran toward Barrie. In addition, Officer Johnson recalled that Green did not "actually see anyone getting stabbed" but believed that Ritcherson was the one who stabbed Barrie.

*Medical Witnesses*

As set out above, the State also called various medical personnel to testify regarding the injuries that Barrie sustained that evening.

First, the State called Dr. Charlie Ross, who testified that he treated Barrie's injuries and that Barrie was stabbed in her left pulmonary artery. Further, he agreed that inserting a knife into a person's chest in a manner that causes a hole in an artery is an act that is clearly dangerous to human life and that the weapon used was capable of causing and did cause serious bodily injury and death.

Second, the State called Dr. Stephen Dewan, who testified that he treated Barrie on the night of the incident and explained that she had "a hole on the upper anterior chest wall that appeared -- that was the entrance side of the wound that we could follow that track through the chest wall, through the lung, through the pericardium and to the pulmonary artery." Further, he explained that for an object to reach the pulmonary artery in the manner at issue here, it would have to be two and a half inches long at least. Moreover, he related that the object would have "to be pretty sharp" and agreed that the injuries were consistent with having been caused by a knife. In addition, he agreed that using a small object in the manner at issue in this case was an act clearly dangerous to human life and that the instrument at issue was capable of causing and did cause serious bodily injury.

Finally, the State called Doctor Vickie Willoughby, who testified that she is a medical examiner and related that the autopsy that she performed on Ritcherson revealed that Barrie died

19

from complications resulting from a stab wound that she suffered to the chest that was inflicted by someone other than Barrie. When describing that initial injury, Dr. Willoughby testified that the tear to the pulmonary artery resulted in blood filling the area around the heart and caused the heart to stop beating. Further, she explained that the wound would have caused Barrie to pass out within seconds or minutes depending on how fast the blood was flowing out of the artery and that she might be able to take "a couple, several" steps right after the injury but would not have been able to run.

In her testimony, Dr. Willoughby related that the injury was three inches deep, that the wound went from left to right and from front to back, and that she was unable to discern whether the wound had any upward or downward angle to it. Moreover, Dr. Willoughby revealed that the size of the wound would have been affected by various factors such as whether the heart was beating at the time of the stabbing, which would have caused the pulmonary artery to move slightly. Accordingly, she explained that the blade could have been longer than three inches or slightly shorter.

Moreover, although she conceded that her analysis could not determine who committed the act or whether it was done intentionally, she agreed that the way that knife was used was capable of causing serious bodily injury or death, that the act of stabbing someone in the chest was an act clearly dangerous to human life, and that using a sharp instrument to penetrate the chest regardless of whether the stabbing was done face to face or over someone's shoulder is an act that creates a substantial risk of death.

*Ritcherson's Arguments in Support of Lesser-Included Instruction*

When asserting that there was evidence presented at trial upon which the jury could have determined that she was guilty of manslaughter and not guilty of murder, Ritcherson urges that

the only evidence pertaining to her intent to kill under the first theory of murder came from Henderson, who testified that Ritcherson attacked Barrie from behind, reached over Barrie's shoulder, and stabbed Barrie with a large knife. Moreover, Ritcherson contends that Henderson's testimony was inconsistent with the medical testimony and evidence presented at trial. Specifically, Ritcherson contends that if Henderson's testimony were accurate, there would have been a wound with a downward angle because Ritcherson was significantly taller than Barrie, but Ritcherson notes that Dr. Willoughby testified that she was unable to tell whether the wound had an upward or downward angle. In addition, Ritcherson contends that if Henderson's testimony were accurate, the wound would have had a right to left track because Henderson testified that Ritcherson reached over Barrie's right shoulder to stab Barrie; however, Ritcherson notes that Dr. Willoughby testified that the wound had a left to right track. Furthermore, Ritcherson notes that none of the medical experts testified that the act demonstrated an intent to kill and that Dr. Willoughby stated that the results of the autopsy could not determine whether the act was done intentionally. For these reasons, Ritcherson argues that the jury may well have determined that the evidence showed that Ritcherson behaved in a reckless and dangerous manner but did not show that Ritcherson intended to kill Barrie.[8]

---

[8] In a related set of arguments, Ritcherson contends that the testimony from Dr. Dewan undermined the assertion that Ritcherson "specifically intended to target and strike the heart." However, under neither theory of murder was the State required to prove that Ritcherson intended to specifically target Barrie's heart when she stabbed Barrie. In any event, we do not believe that the portion of Dr. Dewan's testimony relied on by Ritcherson undermines the evidence establishing that Ritcherson intended to kill Barrie or that Ritcherson intended to inflict serious bodily injury on Barrie. *See* Tex. Penal Code § 19.02(b)(1)-(2). In the portion of the testimony at issue, Dr. Dewan explained that if your goal was to put a hole in the pulmonary artery, you could do it from different angles but that the ideal way would be to go straight through. Further, he explained that you could

21

As a preliminary matter, we note that Ritcherson assumes in this issue that the only evidence indicating that Ritcherson had an intent to kill was the testimony from Henderson because Henderson was the only witness who testified that she saw Ritcherson stab Barrie by reaching over Barrie's shoulder. However, other evidence was presented during the trial that supported Henderson's version of events. In particular, York testified that she noticed that Ritcherson had a knife in her hand before Barrie allegedly hit Ritcherson, and Britney recalled that she noticed a knife in Ritcherson's hand right after Ritcherson was hit. In addition, Uwalogho explained that she saw Ritcherson hold a knife above her head, that Barrie walked away from Ritcherson, that Ritcherson then got away from Moore after Barrie started walking away, and that Barrie was later seen on the ground bleeding. Similarly, Officer Johnson related that when he interviewed Green about what she observed, Green recalled that a group of men were trying to separate Barrie from Ritcherson but that Ritcherson got away from the men and ran toward Barrie. Moreover, as discussed above, Dr. Willoughby testified that an individual with the kind of injury that Barrie sustained might have been able to take a few steps but could not have gone far, which supported the testimony that the stabbing occurred after Barrie started walking away with her friends. In addition, intent to kill can be inferred from the use of a deadly weapon. *Cavazos*, 382 S.W.3d at 384; *see Wingfield v. State*, 282 S.W.3d 102, 107 (Tex. App.—Fort Worth 2009, pet. ref'd) (setting out elements for determining whether knife is deadly weapon, including manner in which it is used). Accordingly, in light of this evidence and

---

hit the pulmonary artery from any position and that there is no optimum position or approach, but he stated that the optimum *surgical* position would be to have the person lying down without clothing on and not moving.

22

the evidence establishing that Barrie was stabbed, the jury could have reasonably inferred that Ritcherson stabbed Barrie in the manner suggested by Henderson.

In any event, we do not agree with Ritcherson's suggestion that the medical testimony presented during the trial disproved Henderson's recollections. Although Dr. Willoughby did testify that she was unable to detect any upward or downward angle to the wound inflicted on Barrie and that the wound tracked from left to right, Dr. Willoughby did not testify that her findings were inconsistent with someone reaching over Barrie's right shoulder to stab her or that the injuries that Barrie sustained could not have been caused by the manner suggested by Henderson. Moreover, the jury could also have reasonably inferred from the testimony regarding the chaotic nature of the events that Henderson did see Ritcherson stab Barrie as Barrie was walking away but that Henderson incorrectly recalled which shoulder Ritcherson reached over.

Even assuming that the medical testimony referred to by Ritcherson could disprove an intent to kill and even assuming that the remainder of the evidence could not establish an intent to kill, the evidence still could have established that Ritcherson was guilty of the alternative charge: that Ritcherson intended to cause serious bodily injury and committed an act clearly dangerous to human life that caused Barrie's death. *See* Tex. Penal Code § 19.02(b)(2). The eyewitness and medical testimony conclusively proved that Barrie was stabbed in the chest, that she died from that injury, and that Ritcherson was the person who stabbed Barrie. In addition, during the trial, Dr. Ross, Dr. Dewan, and Dr. Willoughby testified that inserting a knife into a person's chest is an act that is clearly dangerous to human life and that the instrument used in this case did cause serious bodily injury, and Dr. Willoughby further clarified that using a sharp instrument to penetrate the chest

23

regardless of whether it was done from the front or over the victim's shoulder is an act that carries a substantial risk of death. Moreover, as described earlier, although York and Britney differed in their testimonies regarding when Ritcherson pulled a knife out, both of them testified that they saw a knife in Ritcherson's hand before Barrie was stabbed. Furthermore, Hopkins explained that Ritcherson was waiving an object that looked like a knife, and Uwalogho related that Ritcherson was holding a knife above her head but that Moore was restraining Ritcherson in an attempt to stop her from using the knife. In addition, Moore recalled that he thought that Barrie hit Ritcherson and that Ritcherson made a single overhand swing in Barrie's direction when he tried to pull Ritcherson away, and he later discovered that Ritcherson had a knife in her hand. Accordingly, the jury was free to decide that Ritcherson intended to cause serious bodily injury to Barrie when she stabbed Barrie and that by stabbing Barrie in the chest, Ritcherson committed an act clearly dangerous to life that caused Barrie's death.

In addition to asserting that the medical testimony presented at trial undermined the evidence establishing her intent, Ritcherson also contends that the contradictory descriptions of the knife refuted the evidence that she had the specific intent to kill Barrie. Specifically, Ritcherson contends that although Henderson described the blade as being six inches long, the testimony from other witnesses estimated the size to be approximately two and half inches long. Accordingly, Ritcherson urges that the jury could have concluded that someone using a small knife, "as opposed to a large carving knife, would not necessarily have specifically intended to kill another person, as opposed to merely intending to injure her."

However, as summarized above, the evidence presented during trial, particularly the testimony from Henderson, York, Uwalogho, and Officer Johnson, would have allowed the jury to

24

conclude that Ritcherson intended to kill Barrie by stabbing her in the chest regardless of whether the knife was small or large in size. In any event, as set out previously, Ritcherson was also charged with intending to cause serious bodily injury to Barrie and committing an act clearly dangerous to human life, *see id.*, and the evidence from the witnesses would have allowed the jury to conclude that Ritcherson intended to cause serious bodily injury and committed an act clearly dangerous to human life. In addition, Dr. Dewan testified that even a small object is capable of causing serious bodily injury and that using a small object in the manner at issue in this case would be an at clearly dangerous to human life.

When arguing that she should have been given a lesser-included instruction, Ritcherson primarily focuses on the portion of Moore's testimony in which he agreed that Ritcherson was acting reflexively in response to being hit when she stabbed Barrie and that Ritcherson appeared "shocked or confused" after the act. Accordingly, Ritcherson asserts that the jury could have determined that she "lacked a specific intent, but in her striking out against Barrie with a knife in response to the assault, had disregarded the dangerousness of her actions."

During Moore's testimony, Ritcherson twice posed the question of whether Ritcherson swung her arm at Barrie as "a reflex from having been hit in the head," and Moore answered, "Yes, sir," both times. In the context of the questions being asked, Moore's testimony would seem to more appropriately be read as stating that Ritcherson swung her arm as a reaction to having been hit in the head rather than an assertion that Ritcherson was somehow not in control of her behavior. Indeed, in the question posed by Ritcherson immediately following the two questions described above, Ritcherson asked, "And I think you called that a reaction, correct?" And Moore replied, "Yes, sir."

25

Accordingly, testimony establishing that Ritcherson stabbed Barrie as a reaction to having been hit would not seem to constitute sufficient evidence establishing that Ritcherson did not intend to kill Barrie and that Ritcherson did not intend to cause serious bodily injury to Barrie while also establishing that Ritcherson recklessly caused the death of Barrie.

In a similar case, the court of criminal appeals explained that "[p]ulling out a gun, pointing it at someone, pulling the trigger twice, fleeing the scene . . . , and later telling a friend 'I didn't mean to shoot anyone' does not rationally support an inference that [the defendant] acted recklessly at the moment he fired the shots," "does not support a finding of recklessness[,] and does not rise to [a] level that would convince a rational jury to find that if [the defendant] is guilty, he is guilty of only the lesser-included offense" of manslaughter. *Cavazos*, 382 S.W.3d at 385. Accordingly, the court of criminal appeals concluded that "[w]ithout additional evidence supporting a finding of recklessness," testimony that the defendant stated that he did not intend to shoot anyone "is insufficient to require an instruction on the lesser-included offense of manslaughter." *Id.*

Similarly, we conclude that pulling a knife out, that swinging the knife at another individual and stabbing the individual in the chest as a reaction to getting hit in the head, that appearing confused after stabbing someone in the chest, and that fleeing the scene immediately after stabbing someone would not support a finding of recklessness to a sufficient level that would allow a rational jury to have concluded that if Ritcherson was guilty, she was guilty of only manslaughter. Without additional evidence establishing that Ritcherson acted recklessly, Moore's testimony was insufficient to warrant an instruction on the lesser-included offense of manslaughter.

26

For all of these reasons, we conclude that the district court did not err by denying Ritcherson's request for an instruction on manslaughter. Accordingly, we overrule Ritcherson's first issue on appeal.

**Evidentiary Rulings**

In her next three issues, Ritcherson challenges the district court's rulings regarding the admission of evidence. When reviewing a trial court's ruling on the admission of evidence, appellate courts use an abuse-of-discretion standard of review. *Davis v. State*, 329 S.W.3d 798, 803 (Tex. Crim. App. 2010). Under that standard, a trial court's ruling will only be deemed an abuse of discretion if it is so clearly wrong as to lie outside the zone of reasonable disagreement, *Lopez v. State*, 86 S.W.3d 228, 230 (Tex. Crim. App. 2002), or is arbitrary or unreasonable, *State v. Mechler*, 153 S.W.3d 435, 439 (Tex. Crim. App. 2005). Moreover, the ruling will be upheld provided that the trial court's decision "is reasonably supported by the record and is correct under any theory of law applicable to the case." *Carrasco v. State*, 154 S.W.3d 127, 129 (Tex. Crim. App. 2005).

*Video During the Guilt or Innocence Phase*

As discussed in the first issue, a video recording of Officer Nelson's interview with Ritcherson shortly after the incident was admitted into evidence and played for the jury. A couple of days after that interview, Ritcherson returned to the police station again to meet with Officer Nelson, and this interaction was also recorded. On the video, Ritcherson quickly invokes her right to counsel, and Officer Nelson ended the interview shortly thereafter; however, before he left the room, he did inform Ritcherson that she was under arrest and that Barrie was brain dead and would

likely die from her injuries in the near future. In response, Ritcherson appeared visibly upset and asked if she could talk to Barrie's mother to explain what happened, but Officer Nelson stated that it was too late and that she needed to talk to her lawyer now. After Officer Nelson left the room, he allowed Ritcherson's mother, Patricia Ritcherson, to go into the room to comfort Ritcherson before she was taken to jail.

During Officer Nelson's testimony at trial, Ritcherson informed the district court that she would like to question Officer Nelson outside the presence of the jury regarding her second interview. After the jury was excused, Ritcherson asked whether Officer Nelson told her that she was under arrest, whether she invoked her right to counsel, whether he informed her that Barrie was going to die, whether she became upset, whether she asked to talk to Barrie's mom to explain what happened, whether he left the room shortly thereafter, whether he came back and offered her a trash can in case she became sick, whether he allowed her mother to go into the room, whether she cried when she saw her mom, and whether she talked about the event and indicated that she wanted to kill herself. When Officer Nelson finished answering her questions, Ritcherson stated "we would offer that as an excited utterance under Rule 803." *See* Tex. R. Evid. 803(2).

On redirect, the State asked what Officer Nelson observed when he was in the interview room with Ritcherson. When answering the State's questions, Officer Nelson explained that Ritcherson became emotional and started crying, but he testified that "[s]he didn't tell me anything like . . . I'm sorry." In light of this testimony, the State said that it objected to the admission of Officer Nelson's testimony because she did not make any statements to Officer Nelson. Ritcherson countered and asserted that Ritcherson's statements to Officer Nelson and to her mother

28

were excited utterances that she made after becoming upset when she heard that Barrie would likely die from her injuries. Before making its ruling, the district court clarified that Officer Nelson testified that Ritcherson made no statement to him, and both parties agreed. Accordingly, the district court determined that there was "no excited utterance as to" Officer Nelson and sustained the State's objection. After the district court made its ruling, Ritcherson requested that the video recording of the interview be made part of the appellate record, and the district court agreed to hold onto the video until the end of trial and to send it to this Court as part of the appellate record.

On appeal, Ritcherson asserts that she wanted to introduce into evidence the video recording of her second interview with the police but that the district court denied her request. However, as summarized above, although the district court denied Ritcherson's request to admit into evidence Officer Nelson's testimony regarding the interview, Ritcherson never sought to admit the video of the interview into evidence for the jury to consider it. Instead, Ritcherson sought to have the video included in the record for appellate purposes after the district court ruled that Officer Nelson could not testify regarding statements that Ritcherson made in the interview room. Because Ritcherson never requested that the video be admitted as an exhibit for trial purposes, the district court never made a ruling regarding the admissibility of the video. Accordingly, as the State urges, Ritcherson failed to preserve any issue regarding the admissibility of the video. *See* Tex. R. App. P. 33.1 (explaining that in order to preserve issue for appeal, record must show that complaint was made to "the trial court by a timely request, objection, or motion" and that trial court ruled on request or refused to rule); *cf. Randolph v. State*, No. 01-08-00453-CR, 2012 Tex. App. LEXIS 4589, at *6 (Tex. App.—Houston [1st Dist.] June 7, 2012, no pet.) (mem. op., not designated for publication)

29

(determining that issue asserting that surveillance footage should have been admitted into evidence because it showed person that looked similar to defendant on night of offense was not preserved for appeal because that argument was not made to trial court); *Lewis v. State*, No. 13-11-00468-CR, 2012 Tex. App. LEXIS 2248, at *23 (Tex. App.—Corpus Christi Mar. 22, 2012, no pet.) (mem. op., not designated for publication) (concluding that defendant waived issue regarding whether trial court erred by refusing to play entire video recording rather than portion of it because defendant "did not obtain a ruling from the trial court on his request to play the entire video").

Even assuming that this issue had been preserved, we would be unable to conclude that the district court abused its discretion by failing to admit the video into evidence. Under Rule of Evidence 803(2), "[a] statement relating to a startling event or condition, made while the declarant was under the stress of excitement that it caused" is admissible as an exception to the hearsay rule. *See* Tex. R. Evid. 803(2). Although the Rule may allow for the admission of statements relating "to a *much earlier* incident" when a startling event triggers a spontaneous statement about the earlier incident, *see McCarty v. State*, 257 S.W.3d 238, 240 (Tex. Crim. App. 2008), the statement must occur before the declarant has time to ponder "the consequences of one's exclamation," *White v. Illinois*, 502 U.S. 346, 356 (1992). In other words, for the statement to qualify for the exception, it must be "given under circumstances that eliminate the possibility of fabrication, coaching, or confabulation, and that therefore the circumstances surrounding the making of the statement provide sufficient assurance that the statement is trustworthy." *Idaho v. Wright*, 497 U.S. 805, 820 (1990). Moreover, the proponent of the evidence has the burden of establishing that the evidence falls under a hearsay exception, *Taylor v. State*, 268 S.W.3d 571, 578-79 (Tex. Crim. App. 2008), and when

30

determining whether a statement qualifies as an excited utterance, courts may consider "the lapse of time between the event and declaration, and whether the statement is made in response to a question." *Oveal v. State*, 164 S.W.3d 735, 740 (Tex. App.—Houston [14th Dist.] 2005, pet. ref'd).

The video at issue was made two days after the stabbing, which is a significant period of time under which Ritcherson could have reflected on the offense and on the potential legal consequences stemming from her misconduct. *Compare Martinez v. State*, 178 S.W.3d 806, 814-15 (Tex. Crim. App. 2005) (determining that statement made after victim had been away from offender for over two days did not qualify for excited-utterance exception where no evidence that she was in grasp of excitement or pain), *and Eisenman v. State*, No. 13-05-00705-CR, 2008 Tex. App. LEXIS 282, at *43-44 (Tex. App.—Corpus Christi Jan. 10, 2008, pet. ref'd) (mem. op., not designated for publication) (concluding that statement made two days after offense did not fall under excited-utterance exception when there was no evidence that declarant was experiencing violent emotion, excitement, or pain), *with Apolinar v. State*, 155 S.W.3d 184, 190 (Tex. Crim. App. 2005) (noting that four days between event and statement was "a very long time" to be considered excited utterance but concluding that statement qualified, in part, because declarant was unconscious and heavily medicated for much of that time). Moreover, although the statements that Ritcherson made on the video were not made in response to questions posed by law-enforcement personnel or anyone else and although Ritcherson contends that she made those statements in response to learning that Barrie could die from her injuries and after becoming overcome with emotion, no evidence was offered establishing that Ritcherson was previously unaware of the seriousness of Barrie's injuries or of the possibility that Barrie might not survive. On the contrary, Dobin testified that after Ritcherson and

31

York returned to the car, they drove down the street where the incident happened; that Dobin saw Barrie on the ground and said out loud, "I wonder what happened"; and that there were police on the scene when they drove by.

Accordingly, even assuming that the district court expressly determined that the video could not be admitted and assuming that Ritcherson preserved her complaint for appeal, we would be unable to conclude that the district court would have abused its discretion by determining that the statements on the video were not made under circumstances that assured that those statements were trustworthy. *See Dyke v. State*, No. 06-11-00129-CR, 2012 Tex. App. LEXIS 2181, at *9 (Tex. App.—Texarkana Mar. 21, 2012, pet. ref'd) (mem. op., not designated for publication) (explaining that courts may consider whether statement is self-serving when deciding whether to admit evidence as excited utterance).

For all of these reasons, we overrule Ritcherson's second issue on appeal.[9]

---

[9] As will be discussed more thoroughly in the next issue, the district court did allow Ritcherson's mother to testify in the punishment phase regarding statements that Ritcherson made to her in the interview room because the district court determined that those statements constituted excited utterances. *See* Tex. R. Evid. 803(2). Ritcherson asserts that this later ruling indicates that the district court's ruling regarding the video in the guilt or innocence phase was incorrect.

However, as set out above, it does not appear that Ritcherson actually requested a ruling regarding the admissibility of the video at issue and instead sought to admit testimony from Officer Nelson, and the district court denied that request because Ritcherson did not make the statements at issue to Officer Nelson. In any event, even assuming that the district court did rule that the video was not admissible as an excited utterance during the guilt or innocence phase, we do not believe that the subsequent ruling allowing the testimony of Ritcherson's mother, not the video, into evidence during the punishment phase would somehow compel a conclusion that the district court abused its discretion by not allowing the video into evidence in the first phase. *See* Tex. Code Crim. Proc. art. 37.07, § 3(a)(1) (allowing State and defendant to offer evidence during punishment phase pertaining "to any matter the court deems relevant to sentencing"); *cf. Cedillo v. State*, 901 S.W.2d 624, 627 (Tex. App.—San Antonio 1995, no pet.) (explaining that different policies govern relevancy determinations during punishment phase).

32

*Video During the Punishment Phase*

In her third issue on appeal, Ritcherson asserts that the district court erred when it refused to allow her to admit during the punishment phase the video discussed in her previous issue. During the punishment phase, Ritcherson offered to admit the video during the testimony from her mother, Patricia, and informed the district court that she wanted to play the video as evidence of her remorse. Although the district court allowed Patricia to testify regarding statements that her daughter made to her in the interview room, the district court denied Ritcherson's request to admit the video into evidence. When making its ruling, the district court explained that it was denying the request under Rule of Evidence 403. *See* Tex. R. Evid. 403.

Under Rule 403, a trial "court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence." *Id.* When performing a 403 analysis, courts should balance the following factors:

> (1) the inherent probative force of the proffered item of evidence along with (2) the proponent's need for that evidence against (3) any tendency of the evidence to suggest decision on an improper basis, (4) any tendency of the evidence to confuse or distract the jury from the main issues, (5) any tendency of the evidence to be given undue weight by a jury that has not been equipped to evaluate the probative force of the evidence, and (6) the likelihood that presentation of the evidence will consume an inordinate amount of time or merely repeat evidence already admitted.

*Gigliobianco v. State*, 210 S.W.3d 637, 641-42 (Tex. Crim. App. 2006) (footnote omitted); *see Davis*, 329 S.W.3d at 806 (explaining that "probative value" refers to how strongly evidence makes existence of fact more or less probable and to how much proponent needs evidence and that "unfair

33

prejudice" considers how likely it is that evidence might result in decision made on improper basis, including emotional one). Although appellate courts review a trial court's ruling on Rule 403 grounds for an abuse of discretion, *see Pawlak v. State*, 420 S.W.3d 807, 810 (Tex. Crim. App. 2013), reviewing courts should bear in mind that trial courts are given "an especially high level of deference" for Rule 403 determinations, *see United States v. Fields*, 483 F.3d 313, 354 (5th Cir. 2007). *See also Moreno v. State*, 1 S.W.3d 846, 861 (Tex. App.—Corpus Christi 1999, pet. ref'd) (explaining that "[t]he trial court has broad discretion in determining admissibility of evidence at the punishment phase of trial").

On appeal, Ritcherson contends that the district court abused its discretion because its ruling was inconsistent with the presumption that relevant evidence should be admitted. *See* Tex. R. Evid. 402; *Sanders v. State*, 422 S.W.3d 809, 815 (Tex. App.—Fort Worth 2014, pet. ref'd). Moreover, although she recognizes that relevant evidence may be excluded under Rule 403, she contends that the requirements of that rule were not satisfied. *See* Tex. R. Evid. 403. Specifically, Ritcherson contends that the evidence has strong probative value regarding her remorse, that the video made by the police would not have unfairly prejudiced the State because it merely captured Ritcherson's reaction, that the video would not have confused the jury because the issue of remorse is a relevant consideration when deciding punishment, and that the video would not have misled the jury because playing the video would have allowed the jury to evaluate Ritcherson's emotional reaction and level of remorse.[10] Moreover, Ritcherson asserts that the video would not have caused

---

[10] In her briefs, Ritcherson points out that she sought the admission of the video under the best-evidence rule because the video was the best evidence of the conversation in the interview room. Under the best-evidence rule, "[a]n original writing, recording, or photograph is required in

34

undue delay because the trial had lasted nine days at that point and because the relevant portions of the video totaled 40 minutes or less.[11]  Finally, Ritcherson argues that the video would not have been cumulative of any other evidence because "the video was the only evidence relating to [her] remorse for having caused Barrie's death."

On the video, Ritcherson expressed concern for Barrie's family and stated that Barrie did not deserve what happened to her, that she did not "mean for any of this to happen," that she was sorry for what happened, that she wanted to talk to Barrie's mother to explain what happened, that she did not want to live anymore, and that she was ready to meet her deceased father again. However, in the video Ritcherson also denied responsibility by stating repeatedly that the stabbing was not her fault, attempting to explain that the stabbing occurred because there were "so many people" around, and mentioning that she had never been in a situation like that before.  Moreover,

order to prove its content *unless these rules or other law provides otherwise*." Tex. R. Evid. 1002 (emphasis added).  Although Ritcherson acknowledges that the district court denied the request under Rule of Evidence 403, we also note that this Court recently affirmed a trial court's decision to allow into evidence testimony from a police officer regarding an interrogation that he was a part of without requiring the State to present the video of the interrogation, which the defendant asserted would have been the best evidence of that interrogation. *See Matute v. State*, No. 03-13-00601-CR, 2014 Tex. App. LEXIS 12743, at *11-16 (Tex. App.—Austin Nov. 26, 2014, pet. ref'd) (mem. op., not designated for publication).  In reaching our decision, we noted that various courts have determined that the best-evidence rule does not require the admission of a video recording when one of the participants to or observers of the conversation that was recorded is called to testify. *Id.* at *13-15.

[11] In her brief, Ritcherson states that the district court's ruling "injected a significant inequity of time between the State and [her] punishment phase presentations" because the State presented twice as many witnesses during the punishment phase.  Moreover, Ritcherson urges that the district court evidenced its intention to finish the punishment hearing by 5:00 p.m. that day and that this may have motivated the district court's ruling.  To the extent that this alleged inequitable skewing of time in favor of the State has any relevancy to this issue, we note that the record does not demonstrate that Ritcherson asked for additional time, does not suggest in any fashion that she had not been given enough time, and does not reflect that Ritcherson asked to call additional witnesses but was denied that request.

the focus of the remainder of the video was on topics other than expressing remorse for what she did. For example, Ritcherson discussed various failures that have happened in her life, questioned why this event had to happen, begged her mother to not "let [her] rot" in prison, stated that she had been praying and had lost her relationship with God, expressed frustration at never being able to go to college, and articulated her regret that this event had caused her to lose everything and everyone except her mother and brother.

Moreover, Ritcherson's need for the video for establishing remorse was minimized by the fact that the statements that she made to her mother on the video expressing her remorse were admitted during Patricia's testimony. In particular, Patricia explained that when she was with Ritcherson at the police station, Ritcherson was very upset and crying, that "[s]he kept saying that she wanted to go to her dad," that she no longer wanted to live, and that she wanted to talk with Barrie's mother to express how sorry she was and to say that she never intended to harm Barrie. Furthermore, Patricia did not testify regarding the statements made by Ritcherson in which she denied responsibility for the incident and expressed frustration regarding the incident's effect on her life.

Although the nature of the evidence at issue would arguably have been unlikely to confuse the jury or distract it from the issue of punishment or to cause the jury to give the evidence undue weight, *see Gigliobianco*, 210 S.W.3d at 641 (explaining that scientific evidence is type of evidence that might mislead jury not properly equipped to consider probative value), the district court could have determined that the contents of the video had the potential to encourage a decision on an improperly emotional basis, *see id.* (stating that evidence might encourage decision on improper basis if it arouses jury's sympathy without regard to logical probative force of evidence).

36

The video is disturbingly sad to watch because it shows Ritcherson appearing to be emotionally devastated and overwrought. At first, Ritcherson starts crying after Officer Nelson left the room. Next, Ritcherson starts sobbing and wailing after her mother enters the room, and Ritcherson continues expressing those emotions for approximately 40 minutes before she is taken out of the room. Moreover, given that the district court ruled before ultimately excluding the video that it would allow Ritcherson's remorseful statements to be admitted through the testimony of Patricia as excited utterances, the district court could have determined that admitting and playing the video for the jury would have been repetitive of that testimony.

Furthermore, given that the video at issue was approximately one hour and fifteen minutes long and that even the portion of the video chronicling Ritcherson's outburst was approximately 30 to 40 minutes long, the district court could have determined that playing the video would have consumed an inordinate amount of time in the one-day punishment phase of the trial. *Cf. Hackler v. State*, No. PD-1400-06, 2008 Tex. Crim. App. Unpub. LEXIS 94, at *18 (Tex. Crim. App. Feb. 6, 2008) (Keasler, J., concurring) (not designated for publication) (explaining that video that was approximately one and half minutes long did not take inordinate amount of time to present); *Schiele v. State*, No. 01-13-00299-CR, 2015 Tex. App. LEXIS 1646, at *20 (Tex. App.—Houston [1st Dist.] Feb. 19, 2015, pet. ref'd) (mem. op., not designated for publication) (determining that fact that evidence in dispute spanned 50 pages of 118-page record and was composed of video recordings lasting approximately 30 minutes weighed against admissibility because evidence consumed "not insignificant" amount of time).

37

In light of the preceding, we must conclude that the district court did not abuse its discretion by refusing to admit the video into evidence. Accordingly, we overrule Ritcherson's third issue on appeal.

*Testimony Regarding Extraneous Offense*

In her final issue on appeal, Ritcherson contends that the district court erred by allowing Officer Jared Jensen to testify during the punishment phase regarding statements that her mother Patricia and that her brother Donald Ritcherson made to the officer years before the incident at issue in this case when he responded to a 911 call at their home.

In his testimony, Officer Jensen recalled that he was dispatched to the Ritchersons' home at approximately 4:00 a.m. and that he spoke with Ritcherson, Patricia, and Donald. Regarding his conversation with Ritcherson, Officer Jensen explained that Ritcherson told him that she got in an argument with her brother when she decided to go out that night, that her brother hit her in the face, that she grabbed a knife, and "that she swung the knife at her brother . . . in response to him hitting her." Moreover, Officer Jensen recalled that Ritcherson had a mark on her face and that her hair appeared messed up.

Concerning his conversation with Donald, Officer Jensen related that Donald communicated that Ritcherson was trying to go out for the evening, that Patricia did not want Ritcherson to go out, that he stood in Ritcherson's path to the door, and that Ritcherson got angry "and retrieved a steak knife and attempted to stab him with it." Moreover Officer Jensen testified that Donald stated that Ritcherson "held the knife in her hand and swung it at him," that Patricia intervened, that he was able to get the knife out of Ritcherson's hand, and that Ritcherson called

38

the police after he took the knife away. In addition, Officer Jensen stated that Donald denied hitting Ritcherson.

When discussing his conversation with Patricia, Officer Jensen asserted that Patricia agreed with Donald's version of events, that Donald did not hit Ritcherson, and that she intervened in the fight between her children. Moreover, Officer Jensen recalled that Patricia stated that the mark on Ritcherson's face probably occurred when she tried to keep Ritcherson and Donald separated.

Prior to Officer Jensen testifying, the State called Patricia to testify regarding the incident. In her testimony, Patricia stated that the argument started when she tried to prevent Ritcherson from leaving the house late one evening, that the argument occurred "early morning" at approximately 4:00 a.m., that she asked Donald to help her stop Ritcherson, that Ritcherson grabbed a knife, that she intervened and got between her children, that she and Donald were able to get the knife from Ritcherson, and that Ritcherson called the police after they got the knife away from her.[12]

During the trial, Ritcherson objected to the testimony of Officer Jensen regarding the statements that Patricia and Donald made to him because the evidence did not establish that those statements were excited utterances when they were made, and the district court overruled that objection. *See* Tex. R. Evid. 803(2). On appeal, Ritcherson contends that the district court abused its discretion by admitting into evidence those portions of Officer Jensen's testimony.

As discussed previously, "[a] statement relating to a startling event or condition, made while the declarant was under the stress of excitement that it caused" is admissible as an exception

---

[12] In her testimony, Patricia stated that she could not remember whether Ritcherson swung the knife at Donald.

to the hearsay rule. *See id.* Moreover, in determining whether a statement qualifies for the exception, courts must consider whether the declarant was dominated by the pain, excitement, or fear of the event when the statement was made, *Salazar v. State*, 38 S.W.3d 141, 154 (Tex. Crim. App. 2001), and in making this determination, courts may consider the amount of time elapsed between when the event occurred and when the statement was made and the nature of the declarant as well as whether the statement was made in response to a question and whether the statement was self-serving. *Apolinar*, 155 S.W.3d at 187.

In addition to testifying about the statements that Ritcherson, Patricia, and Donald made when he talked with them after arriving at the Ritchersons' home, Officer Jensen also described how they were acting when he arrived. Specifically, he stated that the scene "was very chaotic"; that Ritcherson, Patricia, and Donald were "very excited" and "very loud"; and that Ritcherson was "very angry" with Patricia, was swearing at him and Patricia, and was very animated. Moreover, he agreed that all three individuals appeared to be under the influence of a recent startling event, and he explained that when he tried to talk with Patricia and Donald individually, Ritcherson continued to yell at them.

Although there was no testimony establishing precisely how long it took Officer Jensen to arrive at the Ritchersons' home after being dispatched to the location, no evidence was introduced indicating that there was a lengthy response time, and the testimony demonstrated that Officer Jensen arrived on the same night that the 911 call was made and that the argument occurred at approximately the same time that the 911 call was made. Accordingly, the district court could have reasonably concluded that the lapse in time between when the fight occurred and when Officer Jensen arrived

40

was minimal. More importantly, Officer Jensen testified that when he arrived at the scene, the individuals involved in the family dispute were excited and appeared to have been involved in a recent startling event, and Officer Jensen explained that the dispute continued when he arrived and when he talked with them. *See id.* at 190 (explaining that testimony that declarant was speaking loudly and was "animated" weighed in favor of determination that statement was excited utterance).

Furthermore, although Officer Jensen testified that he talked with the three family members about what had happened that night, nothing in the testimony of Officer Jensen or of Patricia indicated that the statements that they made were not freely given or that those statements were made in response to questions asked by Officer Jensen that were designed to suggest an answer as opposed to a general inquiry. *See id.* (noting that statement at issue was made in response to question but that question generally asked what happened and that nothing in record suggested that answer was anything other than spontaneous); *see also Oveal*, 164 S.W.3d at 740 (explaining that fact that statements were made in response to questions posed by law enforcement is not dispositive and is only one factor to be considered); *Zuliani v. State*, 97 S.W.3d 589, 596 (Tex. Crim. App. 2003) (concluding that fact that some of declarant's statements were made in response to questions does not make them inadmissible under hearsay exception).

Finally, although the statements made to Officer Jensen by Patricia and Donald might arguably be characterized as self-serving in that they placed the blame on Ritcherson, most of the statements that they made were consistent with statements that Ritcherson herself made to the Officer, including her statement that she grabbed a knife and swung the knife at her brother.

41

*See* Tex. R. Evid. 803(24) (explaining that statements against interest are admissible as exception to prohibition against admission of hearsay evidence).

In light of the preceding, we cannot conclude that the district court abused its discretion when it overruled Ritcherson's objection and allowed into evidence as excited utterances the portions of Officer Jensen's testimony relating statements that Patricia and Donald made to him. Accordingly, we overrule Ritcherson's final issue on appeal.

## CONCLUSION

Having overruled all of Ritcherson's issues on appeal, we affirm the district court's judgment of conviction.

_____

David Puryear, Justice

Before Justices Puryear, Pemberton, and Bourland

Affirmed

Filed:   August 31, 2015

Publish